UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Christopher Mansoori,<br><br>    *Plaintiff*,<br><br>v.<br><br>James Morrison,<br><br>    *Defendant*. | No. 21 CV 6173<br><br>Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

Christopher Mansoori filed this lawsuit under 42 U.S.C. § 1983 alleging he endured unconstitutional conditions of confinement at Cook County Jail based on exceptionally cold temperatures inside his cell between 2019 and 2021. Defendant James Morrison has moved for summary judgment, arguing that Mansoori cannot establish that Morrison was personally involved in any constitutional deprivation, and that he cannot show that the temperature conditions were objectively unreasonable in violation of the Due Process Clause of the Fourteenth Amendment. Alternatively, Morrison argues that he is entitled to qualified immunity.

Because Mansoori has presented no evidence that would allow a reasonable jury to find that Morrison was personally involved in the deprivation, and alternatively because Morrison is entitled to qualified immunity, the motion is granted.

## I. Northern District of Illinois Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

Any party, including a *pro se* litigant, who fails to comply with Local Rule 56.1 does so at their own peril. *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion, even though [employee] is a *pro se* litigant" (cleaned up)); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("even *pro se* litigants must follow procedural rules"); *Parker*

*v. Fern*, 2024 WL 1116092, at *2 (N.D. Ill. Mar. 14, 2024) ("It is well–settled that a plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules.")

Here, Morrison filed a Rule 56.1 statement, and as required by Rule 56.2, Mansoori was served with a "Notice to Unrepresented Litigant Opposing Summary Judgment." [Dkt. 131.][1] This latter filing explains what a motion for summary judgment is and what steps Mansoori needed to take to respond to the motion. As the nonmoving party, Mansoori had to file a response to each statement of fact, which he did. [Dkt. 144.] "Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." L.R. 56.1(e)(2). The Local Rules also explain that a party disputing a certain fact (even if only in part) must "cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." L.R. 56.1(e)(3). The court may deem a fact admitted if a party does not dispute the fact with "specific citations to evidentiary material." *Id.*

At times, Mansoori improperly disputes facts by citing material that doesn't actually dispute the asserted fact, or he disputes a fact without citing to any evidence at all. [Dkt. 144, ¶¶ 13-16, 17, 23-25, 28, 45, 48-49, 54, 60.] For example, he disputes several facts by stating only that he disputes whether the relevant employees "did their job in this case," or that it was the duty of a particular employee to "ensure constitutional living conditions." These facts are not properly disputed and are therefore deemed admitted.

Other times, Mansoori cites to a declaration he filed in opposition to summary judgment. In response to that, Morrison invokes the sham affidavit rule, arguing that Mansoori's declaration does not create a genuine dispute of fact. [Dkt. 155 at 4.] The sham affidavit rule is an exception to the general principle that when there is evidence on both sides of a dispute, including self-serving affidavits, summary judgment is inappropriate. *See, e.g.*, *Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022). As the Seventh Circuit has explained,

> [T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. … The organizing principle of our sham-affidavit practice is simply stated: a *genuine* issue of material fact cannot be conjured out of nothing. We adopted the sham-affidavit rule to weed out unfounded claims, specious denials, and sham defenses.

*James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (cleaned up). The sham affidavit rule is narrow. It does not bar an affiant from trying to clarify or explain away seemingly

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

2

damaging testimony. *See Seshadri v. Kasraian,* 130 F.3d 798, 801-802 (7th Cir. 1997). Nor does it require striking an affidavit in full; only the contradictory portions are disregarded. *See Dunn v. Menard, Inc.*, 880 F.3d 899, 910–12 (7th Cir. 2018). Accordingly, the court will disregard any offending portion of Mansoori's declaration. It also disregards those portions that are not based on personal knowledge. Fed. R. Civ. P. 56(c)(4) (An affidavit or declaration offered in opposition to summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")

Finally, should a party wish to set forth facts not present in or fairly responsive to the nonmoving party's statement, they may do so by submitting an additional statement of material facts. L.R. 56.1(b)(3). The additional statement of facts is subject to the same rules that governed the moving party's statement of facts, meaning it must cite "specific evidentiary material, including the specific page number, that supports it." L.R. 56.1(2). Mansoori filed an additional statement of facts, and the court considers it to the extent supported by the cited evidentiary material. [Dkt. 156.]

Consequently, when Mansoori does not properly dispute them, the court deems Morrison's facts admitted. It also considers relevant facts properly set forth in Mansoori's statement of additional facts and recounts the material facts as favorably to Mansoori as the record and Local Rule 56.1 permit.

## II.   Background

Mansoori entered Cook County Jail in October 2019. [Dkt. 144, ¶ 4.] First, he was housed in Division 6, Tier 1N; later, he was transferred to Division 4, Tier J1. [*Id.*, ¶¶ 7, 51.] According to Mansoori, while in Division 6, cell temperatures were as cold as 45° to 51° Fahrenheit, which caused his teeth to chatter, and prevented him from sleeping. He also suffered headaches and became ill. [*Id.*, ¶ 9.] On a day in November 2019 when the outside temperature plummeted to single digits, Mansoori could see his breath, could not feel his toes when wearing shoes and socks, and his cell felt like a freezer. [*Id.*, ¶ 10.] It is undisputed that on November 7, 2019, a correctional officer provided Mansoori with extra blankets. [*Id.*, ¶ 43.]

Morrison is the Director of the Cook County Sheriff's Office's Building Management and Construction Department. [Dkt. 144, ¶ 2.] His job responsibilities include, among other things, preparing work orders for complaints that arise from detainee grievances related to things like ventilation and temperature conditions at the Jail. [*Id.*, ¶ 12.] Morrison, who is not an engineer, does not evaluate the validity of issues reported to his department, and he is not responsible for performing any maintenance, repairs, or temperature adjustments inside Cook County buildings. [*Id.*, ¶¶ 13-14, 19.] Rather, he serves as a liaison between the Jail and the Cook

County Department of Facilities Management, which is a separate department responsible for maintenance and repairs of all Cook County buildings. [*Id.*]

When he received requests for maintenance or repairs at the Jail, Morrison prepared and submitted work orders to operating engineers or mechanical assistants employed with the Facilities Management department. Once an engineer or mechanical assistant was assigned to a work order, he or she performed the necessary inspections and repairs at the Jail's facilities. This included, for example, inspecting the ventilation system and removing any blockages in air vents that were preventing ventilation from flowing into a cell. [*Id.*, ¶¶ 22-24.]

More generally, Facilities Management is responsible for inspecting the HVAC equipment and air temperature at the Jail by performing daily rounds in eight-hour intervals for each division and tier, and logging both outside air temperature and discharge air temperature levels.[2] [Dkt. 144, ¶ 26, 37; Dkt. 132-9, ¶ 14.] Facilities Management engineers aim to keep building air temperatures within the range of 68° to 77° Fahrenheit. [Dkt. 144, ¶ 27; Dkt. 132-9, ¶ 15.] Temperature readings for the buildings inside the Jail are conducted using ambient thermometers. [*Id.*, ¶ 28.]

Morrison does not hire or supervise Facilities Management engineers or mechanical assistants, nor is he responsible for adjusting temperatures in the Jail. He has never adjusted air temperatures. [*Id.*, ¶¶ 14-15.] Prior to filing this case, Mansoori had never met Morrison. [*Id.*, ¶ 16; Dkt. 132-8 at 18-19.]

*Division 6, Tier 1N Grievances*

Mansoori submitted three grievances relevant to this case. The first two were submitted in November and December 2019, respectively, when Mansoori was housed in Division 6, Tier 1N, both complaining of cold temperatures. [Dkt 132-2 (Grievance No. 2019x12343), 132-3 (Grievance No. 2019x13710).] In response to the first grievance, Morrison generated a work order and sent it to Facilities Management who assigned a mechanical assistant to address the request. [Dkt. 144, ¶ 45; Dkt. 132-9, ¶ 26.] After that mechanical assistant adjusted the discharge air handler that was providing ventilation to Division 6 and cleaned a vent blockage, the request was closed out by Facilities Management engineers. [*Id.*] Morrison's name and signature appear on the back of the grievance form as the person responsible for handling the referral. [Dkt. 132-2 at 4; Dkt. 156, ¶ 1.]

In response to the second grievance in December 2019, Morrison generated another work order and sent it to Facilities Management who assigned a different mechanical assistant to address this request. [Dkt. 144, ¶ 48; Dkt. 132-9, ¶ 27.] That

---

[2] The temperature logs did not always include the tier temperature for every day and every shift, for instance when a Facilities Management engineer could not access a tier for one reason or another, *e.g*, Covid-19 restrictions. [Dkt. 144, ¶ 36.]

4

mechanical assistant closed the outside air damper for Division 6, Tier 1N. [*Id.*] Again, Morrison's name and signature appear on the back of the grievance form as the person responsible for handling the referral. [Dkt. 132-3 at 4; Dkt. 156, ¶ 1.] The bottom half of the grievance noted "standard temperatures range is 68°-77°, air temperatures will only be adjusted when outside of range. Seek medical attention for your medical concerns." [*Id.*]

Temperature logs generated by Facilities Management engineers and produced in discovery indicate that between October 31 and November 30, 2019, and on December 12, 20, 22, and 30, 2019, the temperature in Division 6, Tier 1N ranged between 70° and 76° Fahrenheit. [Dkt. 144, ¶ 49; Dkt. 132-9, ¶ 28; Dkt. 132-9, 18-144.)] Those records also show that on November 12, when the outside temperature was between 9° and 12° Fahrenheit, the temperature in Mansoori's division and tier ranged from between 71 and 72° Fahrenheit. [Dkt. 144, ¶ 50; Dkt. 132-9 at 53-54.] Though Mansoori admits the logs reflect this, he disputes whether these temperature readings accurately describe the living conditions as he experienced them in November and December 2019 on Division 6. [Dkt. 144, ¶ 49; Dkt. 146, ¶ 1 (describing how "almost no heat came out of the vent" "there were holes around the window"; that he could "frequently see my breath and my extremities were frequently numb" from cold.)] He otherwise does not meaningfully dispute the data in the logs.

*Division 4, Tier J1 Grievance*

Mansoori was moved to Division 4, Tier J1 in late December 2020 where he resided through February 2021. [Dkt. 144, ¶ 51.] His cell was equally cold there, he says, in part because he was assigned a corner cell with walls adjacent to the exterior of the Jail. [*Id.*, ¶ 11.] He submitted a third grievance in January 2021 complaining of cold conditions in Division 4. [Dkt. 132-3 (Grievance No. 2021x1377).][3] In response to that grievance, Morrison sent a work order to Facilities Management who assigned an engineer to the request. That engineer documented a "draft felt from windows," but he noted that the vent was "supplying adequate heat to keep cell space temperature in range." [Dkt. 132-9 at 17, ¶ 29.] Mansoori disputes this only by stating that the evidence is "fraudulent" and intended to "conceal the unconstitutional living condition." [Dkt. 144, ¶ 54.]

Temperature logs generated by Facilities Management engineers during daily rounds were taken from a cell three cells down from Mansoori's cell in Division 4, Tier J1. [Dkt. 144, ¶¶ 59-60; Dkt. 132-9, ¶¶ 31-32; Dkt. 132-9, 18-144.] The temperature measured in Mansoori's Division and Tier during daily rounds in January 2021 ranged between 69 and 78° Fahrenheit. [Dkt. 144, ¶ 50; Dkt. 132-9 at 158-200.]

---

[3] Mansoori's was not the only temperature-related grievance submitted between December 2020 and January 2021 for Division 4, Tier J1. [Dkt. 144, ¶ 58.]

5

Having exhausted his administrative remedies, Mansoori filed this lawsuit against Morrison because he was the person who responded to the grievances. [Dkt. 132-8 at 19.]

### III. Legal Standard

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### IV. Analysis

A conditions of confinement claim brought by a pretrial detainee arises under the Fourteenth Amendment and requires the court to apply the objective reasonableness standard set forth in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015); see also *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) ("Pretrial detainees may assert a conditions–of–confinement claim under the Fourteenth Amendment's Due Process Clause."). The Fourteenth Amendment's due process clause prohibits pretrial detainees from being subjected to conditions amounting to punishment. To establish this claim, a pretrial detainee must show that that the conditions are "objectively serious enough to amount to a constitutional deprivation, and the defendant prison official must possess a sufficiently culpable state of mind." *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015).

Jail officials violate a pretrial detainee's constitutional rights when they act unreasonably to objectively serious living conditions that deprive the detainee of basic human needs. *Id.* at 309–10; see also *Burton v. Downey*, 805 F.3d 776, 786 (7th Cir. 2015). This standard requires Mansoori to bring forth evidence that: (1) the conditions in question were objectively serious; (2) Morrison acted "purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) Morrison's actions were "objectively unreasonable—that is, 'not rationally related to a legitimate governmental objective or ... excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring) (quoting *Kingsley*, 576 U.S. at 398).

Though he was a pretrial detainee, there is "little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions–of–confinement claims, and ... such claims brought under the

6

Fourteenth Amendment are appropriately analyzed under the Eighth Amendment test." *Smith*, 803 F.3d at 309; see also *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 n.31 (7th Cir. 2016). Whether a given condition constitutes a violation of a pretrial detainee's constitutional rights depends on its "duration and severity." *Hardeman*, 933 F.3d at 824.

### A. Personal Involvement

Morrison first argues that he is entitled to summary judgment because Mansoori has failed to show that Morrison was personally involved in the conditions Mansoori complains of. The court agrees.

"There is no such thing as respondeat superior liability for government officials under § 1983." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). "A government official is only liable for his or her own misconduct." *Id.* at 493. Though Morrison "need not have participated directly in the constitutional deprivation, [] the allegations must amount to more than vicarious liability" for the unlawful actions. *Id.* at 495. "Prison officials may satisfy the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at the official's direction or with his or her knowledge and consent." *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019).

Here, Mansoori has not come forward with evidence demonstrating personal involvement. He admits that he named Morrison as a defendant because Morrison's name appears on the grievance form as the person responsible for handling the referral. [Dkt. 156, ¶ 1.] But responses (or non-responses) to grievances do not amount to personal involvement for purposes of § 1983. *See, e.g.*, *Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017) ("Prison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance."); *George v. Smith*, 507 F.3d 605, 609–10 (7th Cir. 2007) ("A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not.") Importantly, Mansoori's declaration in support of summary judgment contains no reference to any acts or omissions by Morrison. [Dkt. 146.]

The undisputed evidence does not otherwise reveal personal involvement. Morrison received grievances and issued work orders to be completed by others in a different department. Those orders triggered Facilities Management to assign an engineer or mechanical assistant to investigate temperature conditions and make repairs and adjustments as necessary. It is undisputed that Morrison is not an engineer and has no responsibility for adjusting temperatures at the Jail, nor does he supervise those who do. [*Id.*, ¶ 14; Dkt. 132-7 at 22 (explaining that the "engineers have the responsibility to run the jail to make sure that the temperatures are within range. It's their responsibility.")] This necessarily means that he had no personal

involvement in any constitutional violation, and no reasonable jury could conclude otherwise.

At best, Mansoori argues that Morrison "conceded" it is his duty to ensure "proper" and "constitutional" living conditions," *see* ¶¶ 13-18, dkt. 142 at 3, but this is not evidence of personal involvement. *Whitfield v. Spiller*, 76 F.4 698, 706 (7th Cir. 2023) (summary judgment appropriate where plaintiff proffered no evidence allowing a finding of personal involvement by the warden, noting that the warden's familiarity with institutional practices was not enough to show personal involvement). He cites to no record evidence, for example, showing Morrison exercised oversight over the engineers and mechanics who were responsible for evaluating and correcting temperatures on the tiers. He admits that Morrison had no personal involvement—his brief argues that Morrison "condones or overlooks the unconstitutional conditions by limiting his role to paper pushing and assuming others are taking corrective action, without ever actually checking to make sure conditions are corrected or are proper." [Dkt. 142 at 4-5.]

On this record, summary judgment is appropriate.

### B. Conditions of Confinement and Qualified Immunity

Morrison argues that he is entitled to summary judgment for the additional reason that Mansoori cannot establish objective reasonableness, namely that the conditions were objectively serious; that Morrison acted purposefully, knowingly, or recklessly; or that his actions were objectively unreasonable. *Hardeman*, 933 F.3d at 827. He also argues he is entitled to qualified immunity.

The Constitution allows restrictive and even harsh conditions of confinement. See *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "What the Constitution does not allow, however, is a deprivation of the minimal civilized measure of life's necessities." *Smith v. Kind*, 140 F.4th 359, 370 (7th Cir. 2025). A prison official may not deny an inmate an "identifiable human need such as food, warmth, or exercise." *Id.* "Because warmth is one such need, prisoners have a right to protection from extreme cold." *Id.* (citing *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997)). Whether exposure to cold rises to a constitutional level depends on such factors as "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Id.* at 644.

Morrison presents evidence as to each of these factors, including evidence suggesting that the cells were not abnormally cold for a significant duration, or that the temperatures were so low as to be deemed severe. It is undisputed that temperatures were controlled by a functioning heating and cooling system. Mansoori's declaration and deposition testimony, on the other hand, paint a different picture. He says that while housed in Division 6 cell, almost no heat came out of the

8

vent and the cold temperatures were manifest. While in Division 4, minimal air came through, which was not "nearly enough to overcome the freezing air that came through from around the window" and he described conditions as an "ice box." [Dkt. 146, ¶¶ 1-2.]

Ultimately, the court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (citing *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). "Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770 (cleaned up). Indeed, whether exposure to cold rises to a constitutional level considering the relevant factors is a "fact-intensive inquiry [that] will often be peculiarly appropriate for resolution by the trier of facts." *Smith*, 140 F.4th at 643.

Still, Morrison raises a qualified immunity defense, which "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 365 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Qualified immunity provides "breathing room to make reasonable but mistaken judgments about open legal questions," and protects "all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abbasi,* 582 U.S. 120, 150–52 (2017*)* (internal citations and quotation marks omitted).

When it comes to defeating a qualified immunity defense, establishing a constitutional violation "is only one step, not the finish line." *Smith*, 140 F.4th at 372. Assuming that a reasonable jury could find that Mansoori was exposed to temperatures that rose to a constitutional level, at step two, he must then demonstrate that those rights were clearly established at the time of the violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

"To be clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). The Supreme Court has repeatedly stressed that a constitutional right must be defined at a sufficient level of specificity to give federal officials notice of the bounds of the right. *Id.* ("The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity."). While Mansoori need not identify a case "directly on point," it must be similar enough that the constitutional question is "beyond debate." *Wesby*, 583 U.S. at 64.

Mansoori makes no attempt to meet his burden, *see* dkt. 142 at 5, namely analyzing whether existing precedent puts the legality of Morrison's conduct beyond debate, which "is a necessary part of the qualified-immunity standard." *Kisela v.*

9

*Hughes,* 584 U.S. 100, 105 (2018). Since Mansoori has not carried his burden of defeating qualified immunity, Morrison is entitled to summary judgment on his conditions of confinement claim for this reason, too. *Taylor v. City of Milford,* 10 F.4th 800, 806 (7th Cir. 2021).

## V. Conclusion

Morrison's summary judgment motion is granted.

Enter: 21-cv-6173
Date:   December 3, 2025

_____
Lindsay C. Jenkins